**NOT FOR PUBLICATION**

**UNITED STATES DISTRICT COURT**
**DISTRICT OF NEW JERSEY**

| | |
|---|---|
| MELISSA G., o/b/o D.H.,<br><br>                    Plaintiff,<br>          v.<br><br>KILOLO KIJAKAZI, ACTING<br>COMMISSIONER OF SOCIAL SECURITY,<br><br>                    Defendant. | Civ. A. No. 3:21-cv-12496 (GC)<br><br>**MEMORANDUM OPINION** |

**CASTNER, District Judge**

  **THIS MATTER** comes before the Court upon Melissa G.'s ("Plaintiff") appeal on behalf of D.H., a minor child, from the final decision of the Commissioner of the Social Security Administration ("Defendant" or the "Commissioner"), denying Plaintiff's application for Supplemental Security Income ("SSI") under 42 U.S.C. 1382 *et seq.*  The Court has jurisdiction to review this matter pursuant to 42 U.S.C. § 405(g) and reaches its decision without oral argument pursuant to Federal Rule of Civil Procedure 78 and Local Civil Rule 78.1.  For the reasons set forth below, the Court affirms the Commissioner's decision to deny Plaintiff's minor child social security benefits.

I.   **BACKGROUND**

  A.   **Procedural History**

  Plaintiff filed an application for SSI on March 12, 2018, on behalf of her minor child, D.H., alleging disability beginning on June 13, 2016, due to attention deficit hyperactivity disorder ("ADHD"), a gross motor delay, behavioral and developmental problems, and sensory processing

disorder.  (Administrative Record ("AR") 12, 225-27, ECF No. 5.)  Plaintiff's claim was denied initially on June 22, 2018, and again upon reconsideration on September 25, 2018.  (*Id.* at 12.)  An Administrative Law Judge ("ALJ") conducted an Administrative Hearing (the "Hearing") on December 13, 2019.  Following the Hearing, the ALJ issued a decision on April 28, 2020, finding that D.H. was not disabled.  (*Id.* at 12, 23.)  The Appeals Council denied Plaintiff's request for review on April 14, 2021.  (*Id.* at 1-6.)  On June 14, 2021, Plaintiff filed an appeal to the District Court for the District of New Jersey on June 14, 2021.  (*See* Compl., ECF No. 1.)  The Commissioner filed the Administrative Record on November 9, 2021.  (*See* AR, ECF No. 5.)  Plaintiff filed her brief on April 14, 2022, pursuant to Local Civil Rule 9.1.  (*See* Pl.'s Moving Br., ECF No. 13.)  The Commissioner filed opposition on May 27, 2022, (*see* Def.'s Opp'n, ECF No. 14), and on July 8, 2022, Plaintiff filed her reply (*see* Pl.'s Reply, ECF No. 17).

### B.    Factual Background

Plaintiff's minor child,[1] D.H., was born on October 4, 2011.  (AR 13.) D.H. was in preschool when this application was filed on March 12, 2018.  (*Id.*)  Plaintiff filed her initial claim for disability on the child's behalf alleging an onset date beginning June 13, 2016.  (*Id.* at 12.)

In October 2015, when D.H. was four years old, Rose Merola, M.D., evaluated D.H. for hyperactivity and impulsivity.  (*Id.* at 311.)  On examination, D.H. was reported to be "cooperative, alert, awake, and social/interactive," with some coordination deficits.  (*Id.*)  D.H.'s cognitive level was appropriate for the child's age.  Dr. Merola assessed that D.H. had ADHD and should receive counseling and behavioral modification at school and at home.  (*Id.* at 311-12.)

---

[1] Under the relevant provisions of the Act, a "child" is "an individual who is neither married nor (as determined by the Commissioner []) the head of a household, and who is (1) under the age of eighteen, or (2) under the age of twenty-two and (as determined by the Commissioner []) a student regularly attending a school, college, or university, or a course of vocational or technical training designed to prepare him [or her] for gainful employment."  42 U.S.C. § 1382c(c).

In March 2016, D.H. completed a child study team evaluation performed by the local public school. (*Id.* at 372-389.)  Plaintiff has described D.H. as a "happy little [child]," but added that the child was prone to tantrums if told "no." (*Id.* at 373-74.)  D.H. was also prone to helping his mother and was learning normal child tasks such as learning to set the table, clearing plates after dinner, and caring for a pet hamster. (*Id*. at 374.)  Although D.H. had hit other children in the past, D.H. enjoyed hanging out with his younger brother. (*Id.*)  D.H. was polite, cooperative, and engaging in conversation with the examiner. (*Id.* at 373, 383.)  D.H. provided the examiner with proper attention for a long period of time and had no difficulties participating during the testing. (*Id.* at 383.)  Just after D.H.'s fifth birthday in October 2016, a physical therapy evaluation listed the child's motor functioning at a three- to four-year-old level. (*Id.* at 405.) Physical therapist, Mary Diffily, P.T., indicated that D.H.'s "skills should improve." (*Id.*)

D.H. completed a child study reevaluation in May 2017 at the age of five and a half. (*Id.* at 456-65.)  D.H. showed improvements, such as independence in meeting D.H.'s own needs, the capability of asking for help when needed, more confidence, talkativeness, and enjoying fraternizing with the other children. (*Id.* at 457.)  Plaintiff also noted D.H.'s growth as happy, talkative, and positive with Plaintiff. (*Id.* at 462.)  The same evaluation listed D.H.'s IQ score at 89, which put him in the low average range. (*Id.* at 464.)  D.H. also scored in the low average range on the early academic skills evaluation but was attentive and worked toward his "fullest potential" during the test. (*Id.* at 465, 469.)  During the 2017-2018 school year, D.H. received in class assistance and weekly physical and occupational therapy. (*Id.* at 325-29.)  In the fall of the 2017-2018 school year, D.H. received a positive progress report, which indicated his ability to follow routines and not have any "significant attention problem." (*Id.* at 316.)  D.H. was also engaging in class discussion, raising his hand, and following directions. (*Id.*)  D.H.'s occupational

therapist also indicated progression during this time as D.H. was following routines without struggling, properly transitioning from activity to activity, helping in the classroom by putting away toys and materials, navigating the stairs, pedaling a trike around obstacles, walking across balance beams, gripping a pencil maturely, legibly writing his name, and cutting paper with scissors. (*Id.* at 367.) In the Spring of 2018, D.H. continued to do well in school and at home but was fighting with D.H.'s brother and talking back with his mother. (*Id.* at 595, 677.) At this time, the local Mobile Response and Stabilization Services intervened because of D.H.'s behavior (*Id.* at 422-424.)

Social worker, Alex Valentine, L.S.W., evaluated D.H. during an initial visit in February 2019. (*Id.* at 1045-54.) Plaintiff told Ms. Valentine that D.H. engaged in self-harm when in trouble, urinated in improper places, and had low self-esteem. (*Id.* at 1045.) However, Ms. Valentine did note that D.H.'s judgement was poor because of the child's age, impaired concentration, and trauma from both sexual abuse he faced from a family member and verbal abuse from his father. (*Id.* at 1045, 1046, 1052.)

At the start of second grade, D.H. was reading at a first-grade level. (*Id.* at 1075.) Reports from Plaintiff and D.H.'s teachers indicated that the child continued to grow and develop. (*Id.* at 234-39, 254-60.) D.H. had further educational and psychological testing done in July 2020 and scored in the very low range on the IQ test section, the low average range in basic reading skills, the low range on reading comprehension and fluency, the low average range on mathematic skills, the low average range in math calculation skills, the very low range on mathematical problem solving, and the low average range in oral expression and listening comprehension. (*Id.* at 77, 87-92.) As of May 2021, psychiatrist R. Christopher Stucky, M.D., documented that D.H. suffered from ADHD, disruptive mood dysregulation disorder ("DMDD"), and had a history of sexual

abuse.  (Pl.'s Moving Br. Ex. C, Psych. Eval. 5, ECF No. 13-3.)  In November 2021, D.H. was treated in an emergency room for homicidal ideation, which D.H. denied, but did admit a desire to stab his cousin.  (*Id.* Ex. B, MMC Provider Notes 20, ECF No. 13-2.)  As of the 2021-2022 school year, D.H. received special education classroom instruction a few times a week in addition to weekly counseling.     (*Id.* at attachment D.)     D.H. has been proscribed Amoxicillin, Brompheniramine-Pseudoephedrine, Cefdinir, Levocetirizine, Montelukast, Prednisolone Sodium Phosphate, Sulfamethoxazole, Dexmethylphenidate HC, Methylphenidate Hydrochloride Extended-Release Tablets, Guanfacine, Amphetamine/Dextroamphetamine Salts, and Oxcarbazepine.  (*See* AR 1047, 1063, 1069-70; *see also* Pl's Moving. Br., Ex. C)

### C.     The ALJ's Decision

On April 28, 2020, the ALJ issued a decision finding that Plaintiff's minor child, D.H., is not disabled under 42 U.S.C. 1382 *et seq.*  (AR 13.)  The ALJ found the claimant's minor child was born October 4, 2011, was in preschool on the date the application was filed, and therefore is currently a school-aged child.  *See* 20 CFR 416.926a(g)(2)(iv); (AR 13.)  D.H. has not engaged in substantial gainful activity[2] under 20 CFR 416.924(b) and 416.971 *et seq.* since March 12, 2018, the application date.  (*Id.* at 13.)  The ALJ found D.H. has the following severe impairments: ADHD, mixed, expressive-receptive language developmental disorder, and sleep disorder.  (*Id.*)  The ALJ also found that the minor child does not have an impairment or combination of impairments that meets or medically equals the severity of the ones listed in 20 C.F.R. Part 404,

---

[2] "Substantial gainful activity is work activity that is both substantial and gainful."  20 C.F.R. § 416.971 *et seq.*  Substantial work activity "involves doing significant physical or mental activities.  [A claimant's] work may be substantial even if it is done on a part-time basis or if [he] do[es] less, get[s] paid less, or ha[s] less responsibility than when [he] worked before."  *Id.* § (a).  "Gainful work activity is work activity that the claimant do[es] for pay or profit.  Work activity is gainful if it is the kind of work usually done for pay or profit, whether or not a profit is realized."  *Id.* § (b).

Subpart P, Appendix 1 (20 CFR §§ 404.924, 404.925, and 404.926) (hereinafter, "Appendix 1").

(*Id.* at 14.)  Additionally, the ALJ stated that D.H. does not have an impairment or combination of

impairments that functionally equals the severity under the relevant listings.  (*Id.* at 16.)  Finally,

the ALJ found that D.H. was not disabled as of March 12, 2018, the date the application was filed.

(*Id.* at 22.)

## II.   <u>LEGAL STANDARDS</u>

### A.    **Disability Determination**

An individual under the age of 18 is considered "disabled" and therefore eligible for

benefits "for the purposes of this subchapter if that individual has a medically determinable

physical or mental impairment, which results in marked and severe functional limitations, and

which can be expected to result in death or which has lasted or can be expected to last for a

continuous period of not less than 12 months." 42 U.S.C. § 1382c(a)(3)(C)(i).  The Plaintiff bears

the burden of proving that he or she suffers from a disability under the Social Security Act.  20

C.F.R. § 416.912(a).

When evaluating child disability claims, the Commissioner follows a three-step sequential

evaluation process.  *See generally* 20 C.F.R. § 416.924.  First, the ALJ must determine whether

the claimant is engaged in a substantial gainful activity.  20 C.F.R. § 416.924(b).  At step two, the

ALJ must determine if a claimant has a medically determinable impairment that is severe.  20

C.F.R. § 416.924(c).  If the impairment is severe but does not meet or medically equal any listing,

then the ALJ must decide whether the impairment results in limitations that functionally equal the

listings.  20 C.F.R §§ 416.924(d), 416.926a.  To determine if an impairment or combination of

impairments meets a listing, the ALJ must evaluate a child's ability to function in six areas: (1)

acquiring and using information; (2) attending and completing tasks; (3) interacting and relating

with others; (4) moving about and manipulating objects; (5) caring for yourself; and (6) health and physical well-being.  20 C.F.R. § 416.926a(b)(1).  The ALJ must compare the Plaintiff with a child who does not have an impairment.  *See* 20 C.F.R. § 416.926a(b).  An impairment is equivalent to a listed impairment if the impairment results in "marked" limitations in two areas of functioning or an "extreme" limitation in one area.  20 C.F.R. § 416.926a(a).[3]

---

[3] The regulations define "marked" as:

> interferes seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Marked" limitation also means a limitation that is "more than moderate" but "less than extreme." It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least two, but less than three, standard deviations below the mean.

20 C.F.R. § 416.926a(e)(2)

The regulations define "extreme" as:

> when your impairment(s) interferes very seriously with your ability to independently initiate, sustain, or complete activities. Your day-to-day functioning may be very seriously limited when your impairment(s) limits only one activity or when the interactive and cumulative effects of your impairment(s) limit several activities. "Extreme" limitation also means a limitation that is "more than marked." "Extreme" limitation is the rating we give to the worst limitations. However, "extreme limitation" does not necessarily mean a total lack or loss of ability to function. It is the equivalent of the functioning we would expect to find on standardized testing with scores that are at least three standard deviations below the mean.

20 C.F.R. § 416.926a(e)(3).

### B.  Standard of Review

District courts may "affirm[], modify[], or revers[e] the decision of the Commissioner of

Social Security, with or without remanding the cause for a rehearing."  42 U.S.C. § 405(g).  In

reviewing the decision, the court determines whether the ALJ's findings are supported by

substantial evidence.  *See id.*; *see also Poulos v. Comm'r of Soc. Sec.*, 474 F.3d 88, 91 (3d Cir.

2007).  Substantial evidence is "such relevant evidence as a reasonable mind might accept as

adequate to support a conclusion."  *Reefer v. Barnhart*, 326 F.3d 376, 379 (3d Cir. 2003) (quoting

*Richardson v. Perales*, 402 U.S. 389, 401 (1971)).  "It consists of more than a mere scintilla of

evidence but may be somewhat less than a preponderance of the evidence." *Ginsburg v.*

*Richardson*, 436 F.2d 1146, 1148 (3d Cir. 1971) (internal quotation marks and citation omitted).

The district court is not "empowered to weigh the evidence or substitute its conclusions for

those of the fact-finder."  *Williams v. Sullivan*, 970 F.2d 1178, 1182 (3d Cir. 1992).  Thus, this

limitation on a reviewing court's discretion applies "even if [it] would have decided the factual

inquiry differently." *Hartranft v. Apfel*, 181 F.3d 358, 360 (3d Cir. 1999).  The Court must "review

the record as a whole to determine whether substantial evidence supports a factual finding."

*Zirnsak v. Colvin*, 777 F.3d 607, 610 (3d Cir. 2014) (citing *Schaudeck v. Comm'r*, 181 F.3d 429,

431 (3d Cir. 1999)).  "Since it is apparent that the ALJ cannot reject evidence for no reason or for

the wrong reason, an explanation from the ALJ of the reason why probative evidence has been

rejected is required so that a reviewing court can determine whether the reasons for rejection were

improper." *Cotter v. Harris*, 642 F.2d 700, 706-07 (3d Cir. 1981) (internal citation omitted).

### III.  <u>DISCUSSION</u>

Based on the Court's review of the ALJ's decision, (*see* AR 12-23), and the Administrative

Record submitted by the Commissioner, (*see generally* AR), the Court finds good cause to affirm

the Commissioner's finding that Plaintiff's child is not disabled.  Notably, in reaching a decision, an ALJ must evaluate the evidence and explain the reasons for accepting or rejecting evidence. *Cotter*, 642 F.2d at 706.  Here, the ALJ provided sufficient reasoning for the Court to determine that his findings are supported by substantial evidence.

In support of her appeal, Plaintiff advances four principal arguments: (1) the ALJ did not articulate substantial evidence in the record, (*see* Pl.'s Moving Br. 10-13); (2) new and material evidence warrants remand, (*see id.* at 14-21); (3) Listing 112.04(A)(3) is met based on new evidence, (*see id.* at 21-24); and (4) the ALJ erred by failing to properly evaluate D.H.'s functional equivalency, (*see id* at 24-36.)  The Court will address these arguments in turn.

### A.  Substantial Evidence in the Record

Plaintiff's first chief complaint is that the ALJ did not articulate substantial evidence in the record and specifically failed to properly evaluate Ms. Valentine's examination and "other sources."  (Pl.'s Moving Br. 13.)  When evaluating the record, an ALJ cannot reject evidence for no reason or the wrong reason.  *Morales v. Apfel*, 225 F.3d 310, 317 (3d Cir. 2000) (citing *Plummer v. Apfel*, 186 F.3d 422, 429 (3d Cir. 1999)).  ALJ's are instructed to provide the "factual foundations" of their decision, "so that a reviewing court may know the basis for the decision." *Cotter*, 642 F.2d at 705.  However, an ALJ does not need to evaluate each piece of evidence in writing, so long as the "ALJ articulates at some minimum level her analysis of a particular line of evidence." *Phillips v. Barnhart*, 91 F. App'x 775, 780 (3d Cir. 2004); *see also Fargnoli v. Massanari*, 247 F.3d 34, 42 (3d Cir. 2001); *see also Dellapolla v. Comm'r of Soc. Sec.*, 662 F. App'x 158, 162 (3d Cir. 2016).

Here, the ALJ properly evaluated Ms. Valentine's assessment. The ALJ went into great detail while evaluating Ms. Valentine's report, compared Ms. Valentine's opinions with other

evidence in the record, and explained his reasoning for only providing "some weight" to the assessment. Ms. Valentine opined that D.H. had delays in fine and gross motor functioning and that D.H. could be difficult to direct and redirect, but Ms. Valentine also stated that D.H. was "oriented, guarded, suspicious, and withdrawn." (AR 22.) Ms. Valentine added that D.H. became cooperative during the course of the evaluation. (*Id.*) Additionally, while D.H. had a soft and slurred speech, D.H. exhibited a logical thought process, an intact memory, and limited intelligence. (*Id.*) Furthermore, the ALJ concluded that D.H. did not have more than a mild fine and motor gross delay as D.H.'s medical records stated, "that the claimant had full range of motion in all extremities, normal strength, and no tremors or abnormal movements," and that D.H.'s fine motor skills and handwriting were improving. (*Id.*) The ALJ also highlighted that the medical records indicated that D.H. could hop on a single leg with decreased push off, skip, gallop, and use the stairs properly. (*Id.*) D.H. was also participating in physical education and sports at school and helping Plaintiff around the house with chores. (*Id.*) D.H. occasionally needed to be redirected to focus, but D.H. showed an ability to be redirected and control his temper tantrums. (*Id.*) The ALJ concluded that Ms. Valentine's assessment was "generally consistent with a less than marked limitation in the moving about and manipulating objects domain." (*Id.*)

Following the Third Circuit's directive in *Cotter*, the ALJ provided sufficient foundation in the record as to his findings, which has enabled the Court to follow the ALJ's reasoning for his conclusions. 642 F.2d at 705. The ALJ highlighted that Ms. Valentine's opinions are contradicted by other evidence in the record showing that D.H. could complete tasks adequately and be re-directed to focus. (AR 22, 316, 373, 383, 431, 847, 1068). Additionally, the ALJ did not ignore "substantial, consistent [,] and persuasive" medical opinions. (Pl.'s Moving Br. 13.) The ALJ noted that D.H. had concentration issues due to his ADHD. (*See* AR 19.) However, the ALJ found

10

that the record indicated D.H. had less than marked limitations in attending and completing tasks. (*Id.* at 17.)   The ALJ cited evidence that D.H. is "cooperative, alert, oriented, social, interactive, and able to be redirected to complete tasks and stop tantrums."   (*Id.* at 19, 316, 373, 383, 431, 847.) The ALJ also cited evidence that D.H. "could stay focused on an activity that [D.H.] chose" (*id.* at 20), "participated in class in an orderly fashion, liked to share his thoughts and ideas, acclimated to the classroom well" (*id.*), "completed tasks given to him" (*id.*), "showed improvements, such as independence in meeting [D.H.'s] own needs, asking for help, more talkative…" (*id.* at 21), and helped with chores (*id.* at 22.)   Following *Phillips*, the ALJ does not need to evaluate each piece of evidence in writing, as the "ALJ articulates at some minimum level [his] analysis of a particular line of evidence."   91 F. App'x at 780.   Here, the ALJ properly articulated his analysis.

In addition, the ALJ properly addressed that D.H. does not need a structured and supportive environment to adequately function.   The ALJ highlighted that D.H. participates in special education services and receives some aid from his mother for daily activities but concluded that these facts alone do not mean that D.H. must have "a very structured and supportive environment" to function.   (*See* AR 16-17.)   The ALJ stated, "I evaluate the 'whole child' (*see* Social Security Ruling 09-1p), by considering how the claimant functions at home, at school, and in the community; the interactive and cumulative effects of all of the claimant's medically determinable impairments on the claimant's activities; and the type, extent, and frequency of help the claimant needs."   (*Id.*)   The ALJ also noted that Plaintiff stated "[that D.H. was] helpful, caring, good with his younger brother, and used appropriate hygiene behavior. Further, she reported that D.H. was able to play board and electronic games, color, read, and dance, and enjoyed doing chores, reading, and learning."   (*Id.* at 20.)   The ALJ properly considered the type, extent, and frequency of help that D.H. requires.   While D.H. may prefer help, the ALJ did not err by finding that D.H. does not

need a structured and supportive environment to function because he is entitled to make credibility determinations upon examination of contrary record evidence. *See Fargnoli*, 247 F.3d at 43. Therefore, the ALJ's findings were supported by substantial evidence.

### B.    Newly Submitted Evidence

Next, Plaintiff argues that new and material evidence developed after the ALJ's decision warrants remand.  In rare circumstances, the Court may remand a case back to the Commissioner so additional evidence can be presented following an ALJ's decision.  The Court "may at any time order additional evidence to be taken before the Commissioner of Social Security, but only upon showing that there [1] is new evidence which is [2] material and that there is [3] good cause for the failure to incorporate such evidence into the record in a prior proceeding." 42 U.S.C. 405(g); *Szubak v. Sec' y of Health & Human Servs.*, 745 F.2d 831, 833 (3d Cir. 1983).  In this context, materiality "requires that there be a reasonable possibility that the new evidence would have changed the outcome of the Secretary's determination." *Id; see also Chaney v. Schweiker*, 659 F.2d 676, 679 (5th Cir.1981)).  Furthermore, "an implicit materiality requirement is that the new evidence relate to the time period for which benefits were denied, and that it not concern evidence of a later-acquired disability or of the subsequent deterioration of the previously non-disabling condition." *Szubak, 745* F.2d at 833 (citing *Ward*, 686 F.2d at 765).

Following the ALJ's decision, Plaintiff submitted D.H.'s Individualized Education Programs ("IEPs") from the local school district for review.  (*See* AR 49-97.)  As mandated by 42 U.S.C. 405(g), the Court must remand to the Commissioner if the IEPs present (1) new evidence that is (2) material, and (3) there was good cause shown as to why the evidence was not incorporated into the earlier hearing in front of the ALJ.

12

Under *Szubak*, the Court finds that the IEPs submitted after the ALJ's decision does not relate to the time period between June 13, 2016, D.H.'s alleged disability onset date, and April 28, 2020, the date of the ALJ's opinion.  In April 2019, D.H.'s teacher stated that the child was "a hard-working student. [D.H.] is diligent and motivated.  [D.H.] interacts well with peers and teachers alike." (AR 56.)  Additionally, in April 2020, D.H.'s mathematics teacher stated that D.H. was "doing well with virtual assignments in Google classroom for math.  [D.H.] is able to complete his math trainer assignments each day with 100% accuracy."  (*Id.*)  Plaintiff fails to explain how the evidence offered after the ALJ's decision was not a "subsequent deterioration of the previously non-disabling condition," given the evidence around the time of the decision indicated that D.H. was doing well.  *Szubak, 745* F.2d at 833 (citation omitted).

Plaintiff also submitted new evidence to this Court, which indicated that D.H.'s mental condition has declined since the ALJ's decision.  (*See* Pl.'s Moving Br. Exs. B & C.)  Specifically, D.H. was hospitalized in fall 2021 for suicidal and homicidal ideation.  (*Id.* at 32.)  However, this hospitalization does not shed light on D.H.'s condition for "the time period for which benefits were denied." *Szubak, 745* F.2d at 833 (citation omitted).[4]  Additionally, D.H. was evaluated by Dr. Stucky, a psychiatrist, in the spring of 2021.  Dr. Stucky notes in his evaluation that D.H. was sexually assaulted by a family member.  (Pl. Moving Br., Attachment C.)  Plaintiff argues that additional information surfaced during D.H.'s visit with Dr. Stucky and the psychiatric hospitalization which could have impacted the ALJ's decision.  However, the ALJ had access to the record which explained that D.H. was sexually assaulted by a family member, that D.H. was suffering

---

[4] The Court notes that the record indicates that D.H. was granted SSI by the Social Security Administration based on D.H.'s November 17, 2021, application for benefits, which occurred after D.H.'s mental state had deteriorated in the Spring/Fall of 2021.  *See* Pl.'s Reply, Attachments A, B, C.  This appeal seeks benefits for the time prior to the award of benefits in 2021.

from trauma as a result of the sexual assault, and that D.H. reported nightmares of his father and of ghosts – this information was not new to the ALJ.  (AR 879, 1047-48, 1051-52.)  The evidence from D.H.'s hospitalization and from Dr. Stucky is cumulative of the evidence the ALJ had access to prior to writing his decision.  Therefore, the evidence presented after the ALJ's decision does not warrant remand.

### C.      Whether D.H.'s Severe Impairments Met or Medically Equaled a Listed Impairment

Plaintiff argues that D.H. satisfies the listing requirements under Listing 112.04(A)(3) and 112.15.  (Pl.'s Moving Br. 20-24.)  To satisfy a listing's requirements, an impairment must meet or equal in severity *all* of the listing's criteria.  C.F.R § 416.926(a); *Sullivan v. Zebley*, 493 U.S. 521, 530-31 (1990) (emphasis added).  To satisfy listings 112.04 (depressive, bipolar, and related disorders) and 112.15 (trauma and stressor-related disorders), Plaintiff must satisfy all the requirements listed in both Paragraph "A" and Paragraph "B" or Paragraph "A" and Paragraph "C."  *See* Appendix 1 §§ 112.01, 112.15.  Paragraph "B" criteria requires at least one extreme or two marked impairments in a broad area of functioning like: understanding, remembering, or applying information; interacting with others; concentrating, persisting, or maintaining pace; or adapting or managing themselves.[5]  *Id*.  Paragraph "C" criteria requires a "serious and persistent" mental disorder for at least two years with evidence of "mental treatment, psychosocial support, or highly structured setting that diminishes symptoms and marginal adjustment to changes in daily living."

In understanding, remembering, or applying information, the ALJ found D.H. had moderate limitations.  (AR 14.)  The ALJ also found that D.H. had moderate limitations in interacting with others, concentrating, persisting, or maintaining pace, and adapting or managing himself.  (*Id*.

---

[5] See *infra* note 3 for the relevant regulatory definitions of "marked" and "extreme."

at 14-16.)  The ALJ stated that D.H. had some limitations in his interactions with others.  (*See id.* at 15.)  For instance, the ALJ pointed out that D.H. "urinated on his brother" and "had difficulty with … sharing and taking turns."  (*Id.* at 15, 1045.)  However, the ALJ stated that the "record showed that the claimant was a happy boy who enjoyed playing with other children and had a positive loving relationship with his parents and brother.  In addition, the record also showed that the claimant participated in class in an orderly fashion … he was able to play well and get along with other children."  (*Id.* at 15.)  In maintaining concentration, persistence, or pace, the ALJ credited that D.H. suffered from hyperactivity, but he was typically engaged in class, was able to be redirected, and could complete tasks that were asked of him.  (*Id.* at 15-16.)  The ALJ indicated that he was aware that D.H. had some issues adapting and managing himself, but Plaintiff's testimony showed that D.H. helped around the house, enjoyed his chores, and picked up and put his toys away.  (*Id.* at 16, 374.)  The ALJ found, based on the testimony of D.H.'s teacher, that D.H. "showed improvements, such as independence in meeting [D.H.'s] own needs, asking for help, being more talkative, and having greater self-confidence."  (*Id.* at 15.)  Therefore, substantial evidence supports the ALJ's finding that D.H. did not satisfy the Paragraph "B" requirements.

Based on substantial evidence, the ALJ also properly found that D.H. did not satisfy the Paragraph "C" criteria either. The ALJ found that D.H.'s mental impairments caused at most moderate limitations. The ALJ noted that D.H. needed assistance to manage himself, but not to the "serious and persistent" level mandated by Paragraph "C."  During the time period in question, D.H. only needed basic mental health treatment.  (*See generally* AR.)  D.H. needed some help at home to perform daily tasks, but according to Plaintiff, her child was also quite helpful.  (*Id.* at 374.)  In school, D.H. was mainstream in most subjects, and only received some in-class assistance

in addition to his weekly physical and occupational therapy.  (*See e.g.*, *id.* at 50-51, 325-29.)  The

ALJ did not err by finding that D.H. did not satisfy the Paragraph "C" requirements.[6]

### D.    Functional Equivalent of a Listed Impairment

Plaintiff's final argument is that the ALJ erred by not finding that D.H.'s disability

functionally equaled a listed impairment.  (Pl.'s Moving Br. 24-36.)  Additionally, Plaintiff argues

that the ALJ should have found that D.H. had marked or extreme limitations in attending and

completing tasks, interacting and relating with others, and caring for D.H.'s own needs.  (*Id.*)  For

a child's impairment to functionally equal a disability under a Listing, the ALJ must evaluate the

impairment under the six factors enumerated above, pursuant to 20 C.F.R § 416.926a(b).  The ALJ

then must evaluate the effects of all the child's impairments, both severe and non-severe.  *Id.* §

416.926a(a).  An impairment functionally equals a Listing disability if there is a "marked"

limitation in two areas or an "extreme" limitation in one area.[7]  To add, the ALJ is required to

evaluate the "whole child" by determining how the child functions at home, school, and in the

community.  SSR 09-1p.  As mentioned above, the Court's sole task is to evaluate whether the

ALJ's finding was based on substantial evidence, which is "such relevant evidence as a reasonable

---

[6] D.H. was diagnosed by Dr. Stucky with DMDD on May 12, 2021, after the ALJ's decision. (Pl. Moving Br., Attachment C.)   D.H. was also hospitalized on November 3, 2021, after the ALJ's decision, for homicidal and suicidal ideations and threats.  *Id* at Attachment B.  DMDD satisfies the Paragraph A criteria under Listing 112.04(A)(3). However, D.H. was not officially diagnosed with DMDD until nearly three years after the March 12, 2018, disability application date.  D.H. had regular access to medical professionals, and none diagnosed him with DMDD until Dr. Stucky did in May 2021. The Court finds no medical evidence or testimony in the record to suggest that D.H. was suffering from DMDD prior to the disability application date. Furthermore, as discussed above, the ALJ reasonably concluded that D.H. did not meet the criteria under Paragraph B or C. Therefore, even if D.H. suffered from DMDD prior to applying for benefits, he still would not meet the Listings because the ALJ found neither Paragraph "B" or "C" were satisfied.

[7] See *infra* note 3 for the relevant regulatory definitions of "marked" and "extreme."

16

mind might accept as adequate to support a conclusion." *Reefer*, 326 F.3d at 379 (quoting *Richardson,* 402 U.S. at 401).

Plaintiff contests the ALJ's findings, contending that D.H. suffers from marked or extreme limitations in the following three areas: attending and completing tasks, interacting and relating with others, and caring for oneself.  (Pl.'s Moving Br. 26-35.)  The Court will evaluate each in turn.

First, the ALJ did not err by finding that D.H.'s limitation in the attending and completing tasks area to be less than marked.[8]  According to the regulations, a preschool child (ages 3 to 6) without an impairment should be able to pay attention when spoken to, sustain attention and "should be able to complete puzzles easily, string beads, and build with an assortment of blocks." 20 C.F.R. § 416.926a(h)(2)(iii).  A school-age child (age 6 to 12) without an impairment should be able to focus attention on an array of situations and "to do things like use many kitchen and household tools independently, use scissors, and write." 20 C.F.R. § 416.926a(h)(2)(iv).  The ALJ reasonably concluded that D.H.'s limitation in this area was less than marked. First, the ALJ accounted for D.H.'s problems in this area, but found the record showed that D.H. was able to pay attention with some reminders, frequently played with toys, played video games, and helped his mother with tasks and chores around the house.  (AR 316, 374, 383, 457, 463.)  The ALJ's findings,

---

[8] The regulations define "attending and completing" tasks as:

> how well you are able to focus and maintain your attention, and how well you begin, carry through, and finish your activities, including the pace at which you perform activities and the ease with which you change them.

20 C.F.R § 416.926a(h).

supported by record evidence, form the basis of his conclusion that D.H.'s limitation at attention and completing tasks was less than marked.

Second, the ALJ did not err by concluding that D.H. suffered less than marked limitations in interacting and relating with others.[9]  In this area, preschool children:

> "should be able to socialize with children as well as adults... begin to prefer playmates your own age and start to develop friendships with children who are your age... be able to use words instead of actions to express yourself, and also be better able to share, show affection, and offer to help... be able to relate to caregivers with increasing independence, choose your own friends, and play cooperatively with other children, one-at-a-time or in a group, without continual adult supervision... [and] be able to initiate and participate in conversations."

20 C.F.R. § 416.926a(i).  School-age children "should be able to develop more lasting friendships with children who are your age ... work in groups to create projects ... solve problems ... [have an] increasing ability to understand another's point of view and to tolerate differences."  20 C.F.R. § 416.926a(i)(2)(iv).

The ALJ reasonably concluded that D.H. suffered less than marked limitations when interacting and relating with others.  Plaintiff argues that the ALJ ignored evidence suggesting that D.H. suffered from marked or extreme limitations (*see* Pl.'s Br. Moving 29-33), but the ALJ highlighted that D.H. had some limitations in this area (*see* AR 17-22).  However, the record shows

---

[9] The regulations define "interacting and relating with others" as:

> how well you initiate and sustain emotional connections with others, develop and use the language of your community, cooperate with others, comply with rules, respond to criticism, and respect and take care of the possessions of others.

20 C.F.R. § 416.926a(i).

that D.H. was able to relate and connect with his examiners, typically got along with his teachers and peers during school, and Plaintiff described D.H. as a loving child.  (*Id.* at 373, 383, 457.)

Finally, substantial evidence supports the ALJ's conclusion that D.H. suffered less than marked limitations in caring for oneself.[10]  A preschool aged child "should want to take care of many of your physical needs by yourself … want to try doing some things that you cannot do fully…"  20 C.F.R. § 416.926a(k)(2)(iii).  A school aged child

> "should be independent in most day-to-day activities… begin to recognize that you are competent in doing some activities… be able to identify those circumstances when you feel good about yourself and when you feel bad. … begin to develop understanding of what is right and wrong… begin to demonstrate consistent control over your behavior, and … avoid behaviors that are unsafe or otherwise not good for you…"

20 C.F.R. § 416.926a(k)(2)(iv).

Substantial evidence supports the ALJ's finding that D.H. had less than a marked limitation in caring for the self.  While D.H. sometimes needed reminders, the child was able to perform self-care related tasks.  (AR 238.)  As mentioned above, Plaintiff stated that D.H. enjoyed doing chores in the house such as setting the table, taking care of the family pet hamster, and vacuuming.  (*Id.* at 374.)  D.H.'s teacher stated that he was independent at helping himself in the classroom and following classroom norms and routines.  (*Id.* at 457.)  D.H. encountered some challenges, which the ALJ noted, but the ALJ's finding is one that "a reasonable mind might accept as adequate to

---

[10] The regulations define caring for oneself as:

> how well you maintain a healthy emotional and physical state, including how well you get your physical and emotional wants and needs met in appropriate ways; how you cope with stress and changes in your environment; and whether you take care of your own health, possessions, and living area.

20 C.F.R. § 416.926a(k).

support a conclusion." *Reefer v.*, 326 F.3d at 379 (quoting *Richardson*, 402 U.S. at 401). Therefore, the ALJ's finding that D.H. suffered less than marked limitations in caring for oneself is supported by substantial evidence. To conclude, substantial evidence also supports the ALJ's findings that D.H. did not have marked or extreme limitations in attending and completing tasks, interacting and relating with others, and caring for oneself.

## IV.   <u>CONCLUSION</u>

For the foregoing reasons, and for good cause shown, the Commissioner's decision to deny Plaintiff benefits shall be affirmed.  An appropriate Order follows.

*s/Georgette Castner*
**Dated**: December 27, 2022                                        **GEORGETTE CASTNER**
                                                                                   **United States District Judge**